### THE JASON.
### THE FORT MINGAN.

### AMERICAN S. S. CO. v. WILKINSON.

District Court, S. D. New York.
Nov. 1, 1946.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for libelant.

John F. X. McGohey, U. S. Atty., of New York City (John F. Quarto, Sp. Asst. to U. S. Atty., of New York City, of counsel), for respondent.

CLANCY, District Judge.

On the morning of April 1, 1944, the collier Jason, 536 feet over all, 65 feet beam and 27 feet 8 inches loaded depth, advanced north in the bay and into the East River. She was in the hands of a harbor tugboat pilot. A deep-laden north bound vessel of the Jason's size, seeking the Brooklyn side of the river, follows a range fixed by lights on the Brooklyn shore. Such a vessel closely holding the range will keep 300 feet to starboard the Diamond reef, one point of which was, in 1944, but 24 feet under water. All of the river to port has a depth to accommodate large vessels.

Progressing north to Governors Island, the Jason saw a vessel which turned out to be the British ship Fort Mingan pass the piers at the north end of Buttermilk Channel and proceed up river. The Fort Mingan was light. When it had reached pier 11, Brooklyn, it accomplished a port turn. It was assisted in this maneuver by the three tugs which accompanied it; two at its starboard bow and one on its port quarter. When the Fort Mingan had completed its turn to the point where its bow was beginning to point down the river, her navigator, a tug captain, saw the Jason about one-half mile away emerging from the bay and opposite the north end of Governors Island. He blew two whistles for a starboard passage but the Jason answered immediately with an alarm followed by a single blast to indicate that she desired to pass the Fort Mingan to port. The Fort Mingan immediately accepted this signal by answering with one blast and completed her turn in the river. The tide was ebb and of a strength of two knots. When the Jason signalled the Fort Mingan she reduced her speed to slow and thereafter continued on slow,

which meant that she moved three miles over the land.

Whatever headway remained on the Fort Mingan after the turn was completed was taken off by her own engines which were then stopped but she continued to drift slowly with the tide headed for the north end of Governors Island. When the Jason had come to a point about 200 feet off the Fort Mingan's bow she swung on a sharp port wheel around and up-river. The vessels passed each other at a distance of 150 or more feet. It was when the Jason swung to port that she struck bottom. No whistles were blown by either vessel after the Fort Mingan accepted the Jason's passing signal.

■ The libellant's claim has been prosecuted on the theory that the Jason was forced off her course by the Fort Mingan. The alleged departure from her course is a steering to starboard and then the rounding to port that we have found. The Jason's witnesses claim that the Fort Mingan came down so close that the Jason was compelled to turn first to starboard and then to port to clear first her bow and then her stern of the Fort Mingan's stem. The testimony of the Jason's pilot was that he went forward a distance of 200 feet on a sharp starboard rudder which moved her bow only five or six degrees but sixty or seventy-five feet to starboard in that interval of space and then, on a hard left wheel and her starboard propeller, accomplished a thirty degree turn before he straightened his vessel north in the river. The captain who stood at his side said that the starboard wheel was held only five or six seconds which, at her speed, would involve only a thirty foot movement. On the description of the starboard maneuver attempted by the Jason, given by both her pilot and master, we doubt if her stem moved to starboard at all and if it did, it was for an inconsiderable distance in an advance of 200 feet. The stern, on the contrary, moved immediately to starboard on her port wheel and both agreed that it was immediately after the wheel was spun to port that the vessel scraped bottom. We are therefore compelled to find that the Jason, when she initiated her maneuver, was on the reef and that her port wheel swung her stern over on the portion of it which she scraped. Modern Seamanship, by Knight, at page 328.

■ Furthermore the Fort Mingan's approach had nothing to do with the Jason's position at any time on the range or on the reef. The pilot in charge of the Fort Mingan is held to the knowledge of the direction of the range and its general position, and the fact that deeply laden vessels of the Jason's size must or ordinarily do take it to reach the East River. Just because he is held to this knowledge and to respect the position of a vessel on the range, he is entitled to assume or to conclude that a vessel like the Jason, in coming into the river, is holding herself on the range and to make calculations of his own heading and speed accordingly. The pilot of the Fort Mingan had no other notice of her position with respect to the range and all he had to do was to hold back until the Jason would pass his bow on the course she herself pursued. He did so and the Jason passed him on her course or on an arc to the north and east of it. If the north bound vessel finds itself off the range it must warn its neighbor of its necessity and its intentions to impose either knowledge or duty upon such neighbor. The master of a southbound vessel below pier 9 Manhatten would have to look aft to descry the nearer range light—if it is visible—and further aft continuously as he progressed south in the river. The master of such a vessel is required to devote his attention to the traffic ahead and we think unworthy of consideration a requirement that he be constantly peering aft to line up range lights with which his vessel is not concerned. Mariners are accustomed to approximating distances on the water's surface, but they cannot be asked to locate precisely the range or the position of a vessel with respect to it by exact estimates of their distances from landmarks. Even the pilot of a northbound vessel who owes to it a duty to know all about the reef and to avoid it cannot cast his eye on any place on the river's surface in the reef's vicinity with any real confidence that that spot is or is not over it. That is why the range lights were installed —to relieve him of so fallible a judgment. The master and pilot of the Jason admitted as much when they agreed on an alleged conversation about taking a chance on hit-

7

ting the reef. If they were uncertain of the reef's position, why must the Fort Mingan's pilot know better? The expression "on the range" is pressed upon us as having been used by witnesses to indicate that the Jason followed the strait line established by a navigator sighting both range lights, one above the other, dead on his bow. We do not accept this contention but, on the contrary, find that the expression was used colloquially to mean that the Jason was generally following the direction of the range lights and in the range's neighborhood.

As a matter of fact the Jason itself was never on the range after its signal was accepted by the Fort Mingan. Her pilot himself said that when he first made the range he kept the range lights open to the north to hold his vessel up in the tide and that when his signal was blown he dropped to slow speed then getting the range lights on a line. Thereafter he proceeded on slow and did not testify to any change of course. It would seem established by this testimony that his vessel was dropped down on the reef by the tide. She was certainly on it as we found from his own testimony when the Fort Mingan had reached the position which he protested was sufficiently minatory to force his starboard maneuver. He himself never ascribed to the Fort Mingan his vessel's conduct or position before that.